# SUB-FRANCHISE AGREEMENT

THIS AGREEMENT is entered into by and between

> **TURF HOLDINGS INC.**, a corporation incorporated under the laws of Delaware, with its principal offices at 1129 Wentworth Street, West, Unit B3, Oshawa, Ontario L1J 8P7. ("THI"),

> and

> **MIDWEST LAWN CARE LLC** formed under the laws of the State of Wisconsin consisting of principals Terry Kurth of the State of Wisconsin and Richard J. Brachman II of the state of Wisconsin and Neil F. Wienke of the state of Wisconsin with its principal offices at 2211 Eagle Dr. Middleton, Wisconsin 53562 ("Sub-franchisor"),

> and

> **Terry Kurth** with his principal address at 4041 Observatory Rd., Cross Plains, Wisconsin 53528

> and

> **Richard J. Brachman** with his principal address at 3882 Cardinal Point Trail, Verona, WI 53593

> and

> **Neil F. Wienke** with his principal address at 83 Oak Grove Dr. Madison, Wisconsin 53717

> **("Principals").**

# BACKGROUND

A.      Turf Management Systems Inc. ("TMSI"), an Ontario, Canada corporation, has experience and special know-how in, and has developed and owns a comprehensive system (the "System") for the operation of businesses which provide lawn care services with particular emphasis on eradicating weeds.  The System stresses the quality of products used, prompt and courteous service and guaranteed results.  The System includes a uniform business format, specialized equipment and signs and advertising which use TMSI's trademark WEED MAN.  Lawn care businesses which are operated in association with the Marks and using the System are referred to as "Unit Franchises" in this Agreement.

B.      TMSI has given THI the exclusive right to grant Unit Franchises (defined below in   Section 1.1) within the United States and to sub-franchise others to grant Unit Franchises within the United States.

C.      Sub-franchisor has asked THI to give Sub-franchisor the right to grant Unit Franchises within the geographic area described in Exhibit 1 (the "Territory").  THI has decided to grant this right in reliance on the representations made to it by both Sub-franchisor and the Principals as to Sub-franchisor's financial resources and as to the business acumen of the Principals.

D.      The Principals own all of the issued and outstanding shares in the capital stock of Sub-franchisor.

E.      This Agreement continues and renews the business relationship created by an original Sub-franchise Agreement, executed on August 24, 2000.  The parties intend that this Agreement shall replace the original Sub-franchise Agreement in all respects, shall govern the continuing business relationship of the parties, and shall be effective as of the date and time the 10-year initial term of the original Sub-franchise Agreement expired on August 24, 2010.  The original Sub-franchise Agreement contained revisions and amendments, signed by both parties, which are incorporated into the body of this Agreement.

# AGREEMENT

In consideration of the mutual covenants of the parties and for other good and valuable consideration (the receipt and sufficiency of which is acknowledged), the parties agree as follows:

**ARTICLE 1                DEFINITIONS AND INTERPRETATION**

1.1     Definitions

Where used in this Agreement the following terms have the following meanings:

(a)      "Affiliate" of a person means another person who directly or indirectly controls the first person, or who is directly or indirectly controlled by the first person, or who, together with the first person, is under the direct or indirect common control of a third person. "Control", with respect to any person who is not an individual, means the beneficial ownership of sufficient voting securities or other voting interests to appoint a majority of the directors or other similar managing individuals of the entity.

(b)      "Franchisee" means the owner and operator of a Unit Franchise within the Territory.

(c)      "Franchise Rights" means the right given to Sub-franchisor in Section 2.1 to grant Unit Franchises within the Territory and the other rights given to Sub-franchisor by this Agreement.

(d)      "Manual" is a collective noun and means the confidential WEED MAN operating manuals and all bulletins, notices and other documents (whether addressed to franchisees generally or to Sub-franchisor in particular) which give information or instructions regarding the use of the System and the Marks.

(e)      "Marks" means the trademark WEED MAN and such other trademarks, service marks, designs, symbols, logos and trade names as TMSI designates from time to time for use in association with the operation of lawn care businesses.

(f)      "System" means TMSI's uniform business format and methods for operating a lawn care business in association with the Marks, described above in Recital A of the Background Commentary to this Agreement.

(g)      "Term" means the current 10-year term of this Agreement, beginning on August 24, 2010, and if Sub-franchisor exercises a renewal right under Section 2.2 also means the renewal term.

(h)      "Territory" means the total geographic area as described in Exhibit 1A and Exhibit 1B within which Sub-franchisor has the right to grant Unit Franchises pursuant to this Agreement.  The two portions of the Territory described in Exhibits 1A and 1B were granted at different times and are subject to different financial terms, as described in Article 4.

(i)      "Territory 1" means the geographic area in Wisconsin, Minnesota and Northern Illinois as described in Exhibit 1A within which Sub-franchisor has the right to grant Unit Franchises pursuant to this Agreement.

(j)      "Territory 2" means the geographic area in North Dakota and South Dakota as described in Exhibit 1B within which Sub-franchisor has the right to grant Unit Franchises pursuant to this Agreement.

(k)      "Unit Franchise" means the right to establish and operate a lawn care business using

3

the System and the Marks pursuant to a Unit Franchise Agreement.

(l)    "Unit Franchise Agreement" means those forms of franchise agreement and related franchise documents which THI approves from time to time for use within the Territory, and which Sub-franchisor must use to grant Unit Franchises.

1.2    Time

Time is of the essence of this Agreement.  When calculating the period of time within which or following which any act is to be done or step taken under this Agreement, the day which is the reference date for calculating the period shall be excluded.  If the last day of the period is a non-business day, then the period shall end on the next business day.

1.3    Governing Law

[See Section 14.10]

1.4    Headings, Etc.

The headings and section numbers used in this Agreement are only for the reader's convenience of reference and shall not affect the construction or interpretation of this Agreement.

1.5    Non-Waiver

No party shall be deemed to have waived his right to enforce any obligation of another party under this Agreement unless the waiver is in writing signed by the waiving party.  If a party accepts part performance by another party of an obligation under this Agreement, or accepts payment from another party, that shall not be construed as a waiver by the first party of any right under this Agreement.  No waiver by a party of another party's breach of this Agreement shall act as a waiver of rights regarding any other breach or any subsequent similar breach.

1.6    Parts of Agreement Severable

Each part of this Agreement is intended to be separately valid and enforceable to the fullest extent permitted by law.  If any part of this Agreement is held by any court having jurisdiction to be invalid, illegal or unenforceable because of any rule of law or public policy, then such part shall be validly reformed so as to approximate as nearly as possible the intent of the parties or, if it cannot be not be reformed, it shall be divisible and deleted in such jurisdiction, and such severance shall not affect the remainder of this Agreement.  Any such division and deletion shall not affect the enforceability of this Agreement in other jurisdictions.

4

1.7    Entire Agreement

This Agreement is the entire agreement and understanding between the parties concerning its subject matter, and supersedes all previous oral or written agreements or understandings between the parties regarding that subject matter.  Sub-franchisor and the Principals state that they are not relying on any representation, warranty, promise or other inducement made by or on behalf of THI (whether oral or written, express or implied, statutory or otherwise) as to the business contemplated by this Agreement, as to the rights granted under this Agreement, as to the potential volume of sales, profits or success of the business venture contemplated by this Agreement, or as to any other matter, which has not been expressly stated in this Agreement.  This Agreement may be amended only by a document signed by all of the parties.

1.8    Number, Gender, Persons

In this Agreement the use of the singular number includes the plural and vice-versa, the use of a particular gender includes the other genders and the word "person" includes an individual, a partnership, a body corporate and politic, a trust and any other incorporated or unincorporated entity or organization.

1.9    Independent Contractors

The parties are independent contractors.  Nothing in this Agreement gives any party the right to bind another party to any obligation, or to assume or to incur any obligation on behalf of or in the name of another party.  This Agreement shall not be interpreted to make one party a partner, joint venturer, employee, agent, fiduciary or other representative of another party for any purpose.  Each party shall use his own name when soliciting, negotiating and completing contracts, so that the transaction indicates that he is acting on his own behalf and not for any other party.

1.10    Successors and Assigns

Subject to the restrictions on assignment contained in this Agreement, this Agreement shall inure to the benefit of and be binding upon the parties and their respective heirs, executors, administrators, successors and assigns.

**ARTICLE 2 -        GRANT AND TERM**

2.1    Grant of Franchise Rights

Subject to the terms and conditions of this Agreement, THI grants to Sub-franchisor the right to license qualified persons to operate lawn care businesses within the Territory using the System and the Marks pursuant to a Unit Franchise Agreement.  Such licenses to operate are called "Unit Franchises".  The Territory shall be a geographic area as defined in Exhibit 1A and Exhibit 1B to this Agreement.  Sub-franchisor's right to grant such licenses and its other rights under this Agreement are collectively called the "Franchise Rights."  Sub-franchisor has no right to operate a Unit Franchise directly (but Sub-franchisor may grant one or more Unit Franchises to Affiliates of Sub-franchisor), nor to transfer sub-franchising rights to anyone.

2.2    Term

Subject to early termination as provided in Articles 5 and 11, the rights granted under this Agreement shall be effective immediately upon expiration of the original Sub-franchise Agreement on August 24, 2010 and shall continue in force for an initial period of ten years from that date.  Sub-franchisor may renew the Franchise Rights for successive periods of ten years each, without payment of any renewal fee, provided that each of the following requirements has been satisfied for each renewal:

(a)    Sub-franchisor notifies THI at least six months (but no more than 12 months) before expiry of the then-current term that Sub-franchisor intends to renew the Franchise Rights;

(b)    Sub-franchisor is not in breach of this Agreement, either at the time that it gives its renewal notice or at the expiry of the then-current term, and has substantially complied with all of its obligations under this Agreement throughout the then-current term;

(c)    Sub-franchisor and the Principals release THI and its stockholders, directors, officers and employees from any claims which Sub-franchisor and the Principals may then have against them; except as such claims relate to a breach of the terms of this Agreement, and written notice of any claim of breach has been provided to THI; and

(d)    Sub-franchisor reimburses THI for any costs and expenses which THI may incur in connection with the renewal.

3

2.3      Territorial Rights

As long as Sub-franchisor continues to comply with all of its obligations under this Agreement, during the Term THI will not own or operate a WEED MAN business within the Territory, nor will it grant others the right to own, operate or license the operation of lawn care businesses within the Territory.  Except as limited by the language in this Section 2.3, THI has the absolute right to conduct whatever business it wishes, by any method (including franchising) and using any trademarks and service marks (including the Marks), anywhere within the Territory or elsewhere.

2.4      System Modification

Sub-franchisor acknowledges that additions or other modifications to the System may have to be made from time to time in order to preserve and enhance the public image of the System, to accommodate changing customer needs and to ensure the competitiveness and efficiency of the users of the System.  THI has the right at any time to add to, delete from or otherwise modify the System and the Manual in any manner, but THI will endeavour to consult with Sub-franchisor regarding any such changes where practicable.  Such modification might involve, for example, introducing new trademarks, service marks, designs, symbols, logos or trade names, new products and services, new equipment, and new techniques for the promotion and sale of products and services.  Sub-franchisor shall immediately accept, implement, use and display, and shall ensure that its Franchisees immediately accept, implement, use and display, all such additions or other modifications, at its and their expense.

**ARTICLE 3 -          SERVICES**

3.1      Initial Training

As this Agreement continues and renews the existing business relationship, no initial training will be provided to or required of the Principals.

THI will provide initial training for each Franchisee in how to use the System to establish and operate a WEED MAN business.  Training will be given at THI's offices in Ontario.  For each Franchisee to be trained by THI, Sub-franchisor shall pay THI's standard training fee to THI before the start of training.  THI may change this Franchisee training fee from time to time on 30 days notice to Sub-franchisor.

4

3.2    Documentation

During the initial term of the original Sub-franchise Agreement THI provided Sub-franchisor with the following documentation, and will continue to update this documentation as it may change over time:

(a)    One copy of the Manual, the contents of which shall not be disclosed except to Franchisees pursuant to their Unit Franchise Agreements or to employees of Sub-franchisor who have a "need to know" in order to do their jobs.  Any such permitted disclosure shall be made by Sub-franchisor only in circumstances which will continue to protect the confidentiality of the information disclosed.  The Manual shall remain the property of THI at all times, shall be treated as confidential by Sub-franchisor, and no copies shall be made other than for distribution to Franchisees pursuant to their Unit Franchise Agreements.

(b)    One copy of each of THI's standard form documents used by it elsewhere in the United States to grant Unit Franchises.  Sub-franchisor shall adapt these documents for its own use by amending them as needed to reflect the fact that Sub-franchisor, and not THI, is the franchisor but shall not otherwise change these documents without THI's and TMSI's consent.  THI will not unreasonably withhold its consent.


3.3    General Advice and Guidance

THI will give Sub-franchisor reasonable general advice and guidance regarding use of the System, including the advice and guidance as to:

(a)    Establishing a central office, including requirements for staffing, administration, bookkeeping, accounting and general operating procedures.

(b)    Standards and specifications for WEED MAN products and services.

(c)    Establishing, training and maintaining a staff of qualified field representatives to provide supervisory and consultative services to Franchisees in the Territory.

(d)    Establishing and maintaining a microcomputer system for Sub-franchisor's head office administration.

Advice and guidance will be provided either by personal visit or by telephone, fax or other communication device.

3.4    Advertising Materials

THI will provide Sub-franchisor with copies of the advertising and promotional plans and materials which THI presently uses in its U.S. franchise system, including a copy of THI's current "plain vanilla" Franchise Disclosure Document.  THI will offer to Sub-franchisor copies of new advertising and promotional materials, periodic bulletins and other similar information that THI subsequently prepares during the Term for its U.S. franchise system.  These will be made available at cost plus a reasonable charge for shipping and handling.

3.5    Special Assistance

From time to time as reasonably requested by Sub-franchisor, THI will provide the services of qualified personnel to assist in solving specific problems encountered by Sub-franchisor in using the System within the Territory which are not included in the above services.  Unless agreed otherwise at the time of a request for assistance, Sub-franchisor shall compensate THI for the actual time expended and expenses incurred by THI and its personnel in providing such assistance.  Sub-franchisor is responsible for assisting any of its Franchisee to solve problems encountered in the operation of their Unit Franchises.

3.6    Cost of Services

Except as otherwise stated in this Article 3 the cost of providing the services and materials specified in this Article 3 is included in the fees payable under Article 4.

**ARTICLE 4 -        INITIAL AND CONTINUING FEES**

4.1    Initial Franchise Fee

This Agreement shall continue payment of the Initial Franchise Fee on the same terms as the original Sub-franchise Agreement, under which the Sub-franchisor pays a 25% down payment of the total Initial Franchise Fee, and pays an instalment portion of initial fee every time a Unit Franchise is granted, until the entire Initial Franchise Fee is paid.  Sub-franchisor has agreed to pay THI a total initial franchise fee of six hundred and fifty eight thousand eight hundred and twenty dollars ($658,820) pursuant to the original Sub-franchise Agreement and territorial amendments. Sub-franchisor has paid, and THI acknowledges receiving, an initial down payment instalment of one hundred and sixty four thousand seven hundred and five dollars ($164,705) upon execution of the original Sub-franchise Agreement and territorial amendments.  During the term of the original 10-year agreement Sub-franchisor paid THI, and THI acknowledges receiving, Initial Franchise Fee instalments totalling one hundred and five thousand dollars ($105,000).  The Initial Franchise Fee balance owing at the commencement of this Agreement is therefore $389,115.  The balance owing

6

on the Initial Franchise Fee shall be paid on the schedule described below in this Section 4.1.  Each time Sub-franchisor grants a Unit Franchise it shall pay to THI a further instalment on account of the initial franchise fee, based on the population of the protected trading area given by Sub-franchisor to the Franchisee according to the following table:

| Population Base | Fee Instalment |
| --- | --- |
| Less than 150,000 | $ 5,000 |
| 150,000 to 299,000 | 10,000 |
| 300,000 to 449,000 | 15,000 |
| 450,000 to 599,000 | 20,000 |
| 600,000 to 749,000 | 25,000 |
| etc. | etc. |

(i.e. in increment of $5,000 for population increases of 150,000 people)

until the balance initial franchise fee has been paid.  The initial franchise fee is non-refundable and compensates THI for the initial services which it will be providing under this Agreement, and for opportunities to grant WEED MAN franchises directly within the Territory (and thereby generate initial franchise fee revenue) which THI has deferred or lost by granting the Franchise Rights.

4.2     Unit Fees

(a)     Territory #1 (Wisconsin, Minnesota and Northern Illinois):  Sub-franchisor shall pay to THI a fee (the "Unit Fee") for each Unit Franchise which Sub-franchisor grants.  For Territory #1 this Unit Fee shall be the greater of 20% of whatever initial franchise fee Sub-franchisor charges to its Franchisee, or an amount based on the population of the protected trading area given by Sub-franchisor to the Franchisee according to the following table:

7

| Population Base | Unit Fee |
|---|---|
| Less than 150,000 | $ 4,000 |
| 150,000 to 299,000 | 6,750 |
| 300,000 to 449,000 | 10,750 |
| 450,000 to 599,000 | 13,500 |
| 600,000 to 749,000 | 17,500 |
| 750,000 to 899,000 | 20,250 |
| . | |
| . | |

etc. (i.e. in increments of 150,000 persons and alternating in amount by $4,000 and $2,750)

(b)     Territory #2 (North Dakota and South Dakota ): Sub-franchisor shall pay to THI a fee (the "Unit Fee") for each Unit Franchise which Sub-franchisor grants.  For Territory #2 this Unit Fee shall be the greater of 30% of whatever initial franchise fee Sub-franchisor charges to its Franchisee, or an amount based on the population of the protected trading area given by Sub-franchisor to the Franchisee according to the following table:

| Population Base | Unit Fee |
|---|---|
| Less than 150,000 | $6,000 |
| 150,000 to 299,000 | 10,125 |
| 300,000 to 449,000 | 16,125 |
| 450,000 to 599,000 | 20,250 |
| 600,000 to 749,000 | 26,250 |
| 750,000 to 899,000 | 30,375 |
| . | |
| . | |

etc. (i.e. in increments of 150,000 persons and alternating in amount by $6,000 and $4,125)

If the Franchisee is an Affiliate of Sub-franchisor then the Unit Fee is payable when Sub-franchisor grants the Unit Franchise.  Otherwise, the Unit Fee is payable when Sub-franchisor receives payment of its initial franchise fee from the Franchisee, or if it has not charged an initial franchise fee, then when Sub-franchisor grants the Unit Franchise.

4.3    Royalty

(a) Territory #1: Throughout the Term of this Agreement Sub-franchisor shall pay to THI, for Unit Franchises located in Territory #1, as described in Exhibit 1A., a continuing annual royalty based on the number of Unit Franchises operating in the Territory #1 at any time during the year and determined by reference to the number of production vehicles which the Franchisees used at any time during that year to conduct their business operations.  For each

Franchisee the annual royalty payable on the first two production vehicles which he uses at any time during the year is the greater of (1) $1,600 per production vehicle, or (2) 20% of the royalty which Sub-franchisor charges on those production vehicles for that year.  For the third production vehicle used by the Franchisee at any time during the year the royalty is the greater of (1) $1,120, or (2) 20% of the royalty which Sub-franchisor charges on that production vehicle for that year.  For each subsequent production vehicle used by the Franchisee at any time during the year the royalty is the greater of (1) $800 per production vehicle, or (2) 20% of the royalty charged by Sub-franchisor on those production vehicles for that year.  Each year Sub-franchisor shall pay these royalties in eight equal monthly instalments, starting on March 1 of the year.

(b) Territory 2#: Throughout the Term of this Agreement Sub-franchisor, shall pay to THI, for Unit Franchises located in Territory #2, as described in Exhibit 1B., a continuing annual royalty based on the number of Unit Franchises operating in Territory #2 at any time during the year and determined by reference to the number of production vehicles which the Franchisees used at any time during that year to conduct their business operations.  For each Franchisee the annual royalty payable on the first two production vehicles which are used at any time during the year is the greater of (1) $2,400 per production vehicle, or (2) 30% of the royalty which Sub-franchisor charges on those production vehicles for that year.  For the third production vehicle used by the Franchisee at any time during the year the royalty is the greater of (1) $1,680, and (2) 30% of the royalty which Sub-franchisor charges on that production vehicle for that year.  For each subsequent production vehicle used by the Franchisee at any time during the year the royalty is the greater of (1) $1,200 per production vehicle, and (2) 30% of the royalty charged by Sub-franchisor on those production vehicles for that year.  Each year Sub-franchisor shall pay these royalties in eight equal monthly instalments, starting on March 1 of the year.

4.4     Fertilizer Surcharge

Sub-franchisor has the right to receive and retain for its own account all rebates offered by suppliers in respect of their supply of fertiliser to Franchisees, and THI will turn over to Sub-franchisor any such rebates which THI receives.  THI has the right to receive and retain for its

own account all rebates offered by suppliers in respect of their supply of fertiliser to any WEED MAN lawn care businesses which are located outside the Territory, and Sub-franchisor will turn over to THI any such rebates which Sub-franchisor receives.  Sub-franchisor shall pay to THI a per bag surcharge on all fertilizer products delivered by any supplier to Sub-franchisors and the Franchisees.  As of the date of this Agreement, sub-franchisor is receiving a rebate of $1.20 per bag and is paying THI a surcharge of $0.14 per bag on all fertilizer products delivered by any supplier to sub-franchisors and unit franchisees in the WEED MAN system.  This surcharge shall change proportionately with changes in the total rebate received on all fertilizer products.  This surcharge shall be paid when a rebate is received from any supplier of fertilizer products, based on purchases made by Sub-franchisor and the Unit Franchisees during the year.

4.5     Other Fees

(a) Territory #1(Wisconsin, Minnesota and Northern Illinois):Sub-franchisor shall pay to THI 20% of any renewal, transfer or other fee of any nature which Sub-franchisor receives from its Franchisees located in Territory #1, as describe in Exhibit 1A.  Payment is due within ten days after Sub-franchisor receives payment from the Franchisee.

(b) Territory #2 (North Dakota and South Dakota): Sub-franchisor shall pay to THI 30% of any renewal, transfer or other fee of any nature which Sub-franchisor receives from its Franchisees located in Territory #2, as describe in Exhibit 1B.  Payment is due within ten days after Sub-franchisor receives payment from the Franchisee.

**ARTICLE 5 -          QUOTAS**

5.1     New Franchise Openings

Sub-franchisor must grant sufficient Unit Franchises so that the following numbers of WEED MAN franchises are in operation within the Territory by the dates indicated:

| Date | No. Operating |
| --- | --- |
| December 31, 2001 | 1 |
| December 31, 2002 | 2 |
| December 31, 2003 | 3 |

and so on, so that after December 31, 2011  there are always at least 10 Unit Franchises operating continuously within the Territory.

10

5.2    Failure to Meet Quota

If Sub-franchisor fails to achieve a quota requirement of Section 5.1 and does not cure this breach within 60 days after receiving notice of default, then THI has the absolute right :

(a)    to reduce the size of the Territory to such area as THI unilaterally determines having regard to the degree of success Sub-franchisor has achieved in meeting quota requirements for earlier periods, or

(b)    to declare that the Franchise Rights have become non-exclusive, or

(c)    to terminate the Franchise Rights pursuant to Section 11.1.

If THI chooses to reduce the size of the Territory, then for the remainder of the Term Sub-franchisor shall exercise the Franchise Rights only within the reduced area, the definition of "Territory" in this Agreement shall be deemed to mean such lesser area and the restrictions of Section 2.3 shall apply only to the reduced area.  If THI chooses to declare that the Territory has become non-exclusive, then the restrictions of Section 2.3 shall cease to apply.


**ARTICLE 6 -        ADVERTISING AND PROMOTION**

6.1    National Advertising

THI intends to engage in national advertising and promotion of the products and services distributed by the WEED MAN System when it feels that there are a sufficient number of WEED MAN franchises in operation to justify such a campaign.  At that time THI will formulate, develop, produce and conduct national advertising and promotional programs (collectively the "National Advertising Programs" for the benefit of all WEED MAN franchises in the U.S.  THI may retain an advertising agency to formulate, develop, produce and conduct the National Advertising Programs. Sub-franchisor understands and acknowledges that the National Advertising Programs are intended to maximise general public recognition and acceptance of the WEED MAN System for the benefit of all franchisees using the System, and THI has no obligation to ensure that any particular user of the System, including Sub-franchisor, benefits from the placement or conduct of the National Advertising Programs either directly or in proportion to his advertising contributions.  THI has the absolute right to make all decisions regarding the mix of national, regional and local advertising, selection and content of media, and any other decisions concerning the National Advertising Programs.


6.2    Regional Advertising

Until such time as THI notifies Sub-franchisor that THI has started to develop the National

Advertising Programs, Sub-franchisor shall actively advertise and vigorously promote the Marks and the System throughout the Territory by formulating, developing, producing and conducting advertising and promotional programs (collectively the "Regional Advertising Programs") for the benefit of Sub-franchisor and all Franchisees. All decisions regarding the selection of particular media and content for the Regional Advertising Programs shall be made by Sub-franchisor.  Sub-franchisor's advertising (including the Regional Advertising Programs) shall be conducted in a manner that reflects favourably on the Marks, the System and the good name, goodwill and reputation of TMSI and THI, and in a manner which will foster customer confidence in the Marks. Sub-franchisor shall not engage in any advertising or promotion that is or may be deceptive or otherwise misleading.  All advertising and promotion done by Sub-franchisor and its Franchisees shall be completely factual, shall conform to the highest standards of ethical advertising and shall be consistent with the advertising policies and practices established by THI and TMSI from time to time.

6.3     Pre-Approval of Advertising

Whenever feasible Sub-franchisor and its Franchisees shall submit to THI for approval, before use, all advertising and promotional material which they develop and which bear any of the Marks.  Sub-franchisor shall immediately stop using and shall ensure that its Franchisees immediately stop using any advertising or promotional material of which THI disapproves.

6.4     Regional Ad Fund

To help pay for the cost of the Regional Advertising Programs Sub-franchisor shall establish and maintain an advertising fund (the "Regional Ad Fund") for the benefit of Sub-franchisor and all System users in the Territory.  Until THI notifies Sub-franchisor that THI has started to develop the National Advertising Programs, Sub-franchisor shall deposit into the Regional Ad Fund all advertising contributions which it receives from the Franchisees pursuant   to their Unit Franchise Agreements and Sub-franchisor shall also pay into the Regional Advertising Fund its own contribution equal to 50% of the advertising contributions which are payable by the Franchisees. These Sub-franchisor contributions are payable at the same times as the Franchisees' adverting contributions are payable.  Contributions to the Regional Ad Fund shall not be commingled with Sub-franchisor's general operating revenue but shall be deposited into a separate bank account, to be administered by Sub-franchisor.  The Regional Ad Fund shall be used by Sub-franchisor only to reimburse itself for media costs, commissions, market research costs, creative and production costs and other costs which it has incurred for regional advertising and promotional programs undertaken by Sub-franchisor within the Territory, including a reasonable charge for administering the Regional Ad Fund.  The Regional Ad Fund shall not be used to advertise or promote the sale of franchises. Sub-franchisor shall provide THI and each Franchisee annually with a written accounting of all receipts and disbursements of the Regional Ad Fund, reported on by Sub-franchisor's independent certified public accountants, whose report must state that the Regional Ad Fund was spent in accordance with the requirements of this Agreement.

12

6.5    National Ad Fund

When THI notifies Sub-franchisor that THI has started the National Advertising Programs, Sub-franchisor shall wind down the Regional Advertising Programs in an orderly manner but shall continue to collect the advertising contributions which are payable by Franchisees pursuant to their Unit Franchise Agreements, and for the remainder of the Term Sub-franchisor shall pay to THI an annual advertising contribution to help support the National Advertising Programs.  The amount of Sub-franchisor's annual advertising contribution shall be 20% of the annual royalty payable to Sub-franchisor by the Franchisees pursuant to their Unit Franchise Agreements plus another 50% of such 20% (that is, 30% in all of the annual royalty stream payable by the Franchisees to Sub-franchisor). Sub-franchisor shall pay this annual advertising contribution in three equal monthly instalments starting May 31 in each year.  Contributions made by Sub-franchisor pursuant to this Section 6.5 (and therefore made in part by the Franchisees indirectly, since Sub-franchisor will be keeping their advertising contributions) and contributions received by Sub-Franchisee from its other U.S. franchisees will not be commingled with general operating revenues of THI, but will be deposited into a separate bank account to form a fund (the "National Advertising Fund") for the benefit of all System users in the U.S.  The National Ad Fund will not be used to advertise or promote the sale of franchises.  THI will administer the National Ad Fund.  All costs incurred by THI in connection with the National Advertising Programs (including media costs, market research costs and production costs and overhead, and the fees and disbursements of any advertising agency retained pursuant to Section 6.1) shall be paid from the National Ad Fund.  THI may reimburse itself from the National Advertising Fund for its reasonable administrative expenses of conducting the National Advertising Programs and administering the Advertising Fund.  In any year THI may spend an amount greater or less than the total contributions made to the National Ad Fund in that year, may make loans at reasonable interest to the National Ad fund to cover deficits, and may invest any surplus for future use by the National Ad Fund.  Upon request THI will give Sub-franchisor an annual unaudited accounting of the receipts and disbursements of the National Ad Fund.

**ARTICLE 7 -        MARKS**

7.1    Use of Marks

Sub-franchisor may use the Marks only in association with the distribution of wares and services previously approved in writing by TMSI and THI and not subsequently disapproved, and only from specific locations which have been previously approved in writing by THI.  Sub-franchisor shall use the Marks only in the manner permitted by this Agreement and the Manual,

and shall operate its business using the Marks without any accompanying words or symbols of any nature.  None of the Marks nor any confusingly similar words may be included in Sub-franchisor's corporate name.  Sub-franchisor shall not permit a Franchisee to use the Marks except in accordance with his Unit Franchise Agreement and any pertinent sections of the Manual.

7.2    Integrity of Marks

Sub-franchisor shall not take any action which might invalidate the Marks, impair any rights of TMSI or THI in the Marks or create any rights adverse to those of TMSI and THI.  Sub-franchisor shall use the Marks correctly spelled and depicted, not as a verb, and not in the plural or in any other manner which might endanger the validity of the Marks or their registrability.  Sub-franchisor shall use the Marks only in style as registered or, if not registered, as prescribed by TMSI and THI.

7.3    Ownership of Marks

Neither this Agreement nor the operation of Sub-franchisor's business shall give Sub-franchisor any interest in the Marks except the right to use and display the Marks strictly in accordance with the terms of this Agreement.  Sub-franchisor shall not use the Marks in any manner calculated to represent that Sub-franchisor owns them.  All goodwill arising from use of the Marks by Sub-franchisor or its Franchisees shall inure solely to the benefit of and shall belong exclusively to TMSI.  During and after the term of this Agreement Sub-franchisor shall not dispute or contest, directly or indirectly, the validity or enforceability of any of the Marks nor directly or indirectly attempt to depreciate the value of the goodwill attaching to any of the Marks, nor counsel, procure or assist anyone else to do any of these things.

7.4    Disclosure of Franchisee Status

Except for use of the Marks as specifically provided this Agreement, Sub-franchisor shall carry on business under its own name, shall enter into agreements only in its corporate name, and shall advise each supplier and all other persons with whom Sub-franchisor deals that Sub-franchisor is an independent contractor and that all debts incurred by Sub-franchisor are for its own account.  Sub-franchisor shall display prominently at each location where it uses or displays any of the Marks a sign in form prescribed by THI from time to time, indicating that the Marks are registered trademarks of TMSI, that Sub-franchisor is a franchisee of THI and that both THI and Sub-franchisor are authorized licensees of the Marks.  If Sub-franchisor uses any of the Marks on any stationery, invoices, purchase orders or similar documents, such material shall plainly disclose on its face similar information.  Before Sub-franchisor uses any

14

additional or substitute trademark, service mark, design, logo, symbol or trade name of TMSI, Sub-franchisor shall amend such signs and materials at its own expense to explicitly refer to each additional or substitute Mark.  Immediately following expiry or termination of the Franchise Rights, Sub-franchisor shall remove and destroy all such signs, and shall deliver to THI (or at THI's option shall destroy) all such material, and within the following ten days shall deliver to THI an affidavit of one of the Principals stating that Sub-franchisor has destroyed all such signs and has returned or destroyed all such material.

7.5     Infringement

Sub-franchisor shall notify THI immediately of any infringement of or challenge to Sub-franchisor's or its Franchisees' use of the Marks, and TMSI and THI alone shall have the absolute right to determine what action, if any, will be taken to deal with such infringement or challenge and shall have the absolute right to control any litigation or proceeding relating to any of the Marks.  If, because of any such infringement or challenge, TMSI or THI deems it advisable for Licensee to modify or discontinue the use of any of the Marks or to use one or more additional or substitute trademarks, Sub-franchisor shall do so and THI shall reimburse Sub-franchisor for the actual expenses reasonably incurred by Sub-franchisor in replacing signs or other printed material used in the conduct of its business which bear the Marks to be modified or discontinued.  At THI's and TMSI's cost Sub-franchisor shall co-operate with and assist TMSI in the prosecution or defense of any proceedings with respect to the Marks, and shall execute such documents and do other things as counsel for TMSI and THI deems necessary or advisable.

7.6     Change of Marks

If ever THI notifies Sub-franchisor that THI deems it advisable for Sub-franchisor to modify or discontinue the use of any of the Marks, or to use one or more additional or substitute trademarks, service marks, designs, logos, symbols or trade names, then Sub-franchisor shall do so immediately, at its own expense unless the provisions of Section 8 apply in which case   licensor shall reimburse Licensee as provided therein.  This Agreement shall apply to any such new or modified trademark and the definition of "Marks" shall be deemed modified accordingly.  Sub-franchisor shall stop all further use of any discontinued trademark immediately.

7.7     Further Assurances

Immediately upon request by THI Sub-franchisor shall execute and cause its Franchisees to execute such agreements or other instruments as THI requires in order to protect the rights of TMSI and THI in the Marks.

**ARTICLE 8 -        ACCOUNTING AND REPORTING**

8.1     Business Records

Sub-franchisor to keep full accounts and complete books and records relating to its operations, and to keep all reports submitted to it by its Franchisees, for a period of six years after date of original entry or receipt.  Sub-franchisor acknowledges that the information and reports which it must submit under this Agreement are for THI's information, and that THI has no obligation to review or to comment on such information.

8.2     Periodic Reporting

Sub-franchisor shall deliver to THI:

(a)     within 120 days after the end of each fiscal year of Sub-franchisor a comparative balance sheet of Sub-franchisor as at the close of that year, and comparative statements of earnings, retained earnings and source and application of funds for the year, accompanied by the review engagement report of Sub-franchisor's external certified public accountants, and accompanied by such other information and supporting records as THI may reasonably require;

(b)     by the 20th of each month copies of the reports, information and financial statements required to be furnished to Sub-franchisor by Franchisees during the previous month pursuant to their Unit Franchise Agreements; and

(c)     by the tenth of each month a report of all WEED MAN franchise openings or closings in the Territory and the reasons for the closings.

8.3     Inspection and Audit

At any time during business hours and with 24 hour prior notice THI may inspect, copy or cause to be audited all business books, records, reports and reporting procedures of Sub-franchisor. Sub-franchisor agrees to cooperate fully with representatives of THI or independent accountants hired by THI to conduct any such inspection or audit.  If any inspection or audit discloses an understatement of amounts owing by Sub-franchisor to THI for any period, then Sub-franchisor shall pay the amount owing to THI on account of such

16

understatement within ten days after receiving the inspection or audit report.  If the inspection or audit was made because Sub-franchisor did not furnish a report, financial statement or any other information required by the terms of this Agreement, or if the inspection or audit discloses an underpayment of royalties or any other amount owing to THI for any period by more than 3%, then Sub-franchisor shall reimburse THI on demand for the cost of the inspection or audit, including the charges of any independent accounting firm and the travel expenses, room and board of THI's employees who participated in the inspection or audit, all without prejudice to any other rights which THI may have as a result of the understatement or failure to report.

**ARTICLE 9          ADDITIONAL OBLIGATIONS**

9.1      Recruiting Franchisees

Sub-franchisor shall use best efforts to recruit potential Franchisees using such general criteria and standards as are specified by THI from time to time for evaluating prospective franchisees.  Sub-franchisor and the Franchisee shall execute a Unit Franchise Agreement for each Unit Franchise which Sub-franchisor grants (including those granted to Affiliates of Sub-franchisor).  The form of Unit Franchise Agreement to be used shall be that adapted by Sub-franchisor and approved by THI pursuant to Section 3.2, and any amendments to that Unit Agreement requested by the Franchisee shall be subject to THI's prior written approval.  Sub-franchisor shall not permit any Franchisee to open for business until the Franchisee has executed a Unit Franchise Agreement with Sub-franchisor.  Sub-franchisor shall forward to THI a fully-executed original copy of each Unit Franchise Agreement within five days after it is signed.

9.2          [INTENTIONALLY DELETED]

9.3      Compliance With Applicable Law

In dealing with Franchisees and otherwise conducting its business, Sub-franchisor shall comply with all applicable laws and regulations, including franchise disclosure, registration and relationship laws.  Sub-franchisor shall provide THI for its review with a true copy of any disclosure documentation which Sub-franchisor proposes to use and shall amend such document before use as THI may require in order to correct a misrepresentation.  Sub-franchisor agrees that THI will be reviewing such disclosure only as it pertains to THI, TMSI or the System and that Sub-franchisor has the primary responsibility to ensure the accuracy of all such disclosure.  In recruiting Franchisees and otherwise operating its business Sub-franchisor shall not make or permit its agents or employees to make any representations which are untrue or misleading in any material respect, nor engage in any other unfair business practise.

9.4     Perform Franchise Covenants

Sub-franchisor shall fulfil its obligations as franchisor to each of its Franchisees.  Without limitation, Sub-franchisor shall perform its obligations under each Unit Franchise Agreement relating to continuing (but not initial) training of Franchisees, pre-opening and opening assistance and provision of continuing supervision, advice and guidance in the operation of a Unit Franchise, the use of the Marks and the implementation of the System within the Territory.

9.5     Protect System

Sub-franchisor will take such steps as THI requires in order to protect the integrity of the System, including supervising each Franchisee in the manner in which the Marks are used and the System is implemented within the Territory.  If any Franchisee breaches his obligations under his Unit Franchise Agreement, then Sub-franchisor shall enforce such obligations by all reasonable means, including commencement and diligent prosecution of legal proceedings, and if necessary or if requested by THI or TMSI shall terminate the Unit Agreement in accordance with its terms.

9.6     Personnel

Sub-franchisor shall maintain a sufficient number of qualified personnel to regularly and properly supervise Franchisees in the operation of their Unit Franchises and shall maintain appropriate office facilities, accounting services and similar support services within the Territory.

9.7     Maintain Standards

Sub-franchisor acknowledges that maintaining the standards of the System is essential to the integrity, reputation, goodwill, success and continued public acceptance of the WEED MAN system.  Accordingly, Sub-franchisor agrees to comply fully and to cause its

Franchisees to comply fully with all specifications, standards, operating procedures, policies and rules prescribed by THI or by TMSI from time to time.  Without limitation, at all times during the Term Sub-franchisor and its Franchisees shall:

(a)    maintain all of the System standards of quality and uniformity for the products and services being distributed in association with the Marks, including all those relating to customer service;

(b)    offer for sale and sell only such goods and services as TMSI and THI authorize in writing from time to time; and

(c)    use only such formulations of lawn care products and purchase only from such suppliers as are designated in writing by THI and TMSI from time to time.

Specifications, standards, operating procedures, policies and rules may appear in the WEED MAN operating manuals or in books, pamphlets, memoranda or other publications prepared by TMSI or by THI for franchisees generally or for Sub-franchisor in particular, and all such operating manuals and other writings are referred to collectively in this Agreement as the "Manual".  The Manual and all such specifications, standards, procedures, policies and rules shall form part of this Agreement as if they were specifically set out in this Agreement, and the words "this Agreement" include all of these.  TMSI and THI may amend the Manual from time to time, and Sub-franchisor shall implement and shall cause the Franchisees to implement all such changes.  Sub-franchisor shall put the Manual change pages in their proper place in its copy of the Manual and shall remove and destroy the superseded pages.  If there is any conflict between Sub-franchisor's copy of the Manual and the copy maintained by THI, then THI's copy of the Manual shall govern.

9.8    Inspection Rights

In order to preserve the validity and integrity of the Marks and to ensure that Sub-franchisor is properly using the Marks and the System in the operation of its business pursuant to this Agreement, at any time during business hours and with 24 hour prior notice THI's representatives may enter and inspect all premises from which Sub-franchisor conducts its business, may observe the manner in which Sub-franchisor conducts that business, may confer with Sub-franchisor's employees and customers, and may take without charge samples of products, chemicals and other items of any nature for evaluation, to ensure that the quality and uniformity standards of the System and the other requirements of the Manual and this Agreement are being met.  Sub-franchisor shall cause its directors, officers and employees to co-operate with representatives of THI who make any such inspection.  Sub-franchisor shall ensure that THI has a similar right to enter, inspect, observe and take samples at the business premises of the Franchisees.  THI will notify Sub-franchisor of any deficiencies detected

during inspection and Sub-franchisor shall correct the deficiencies immediately.

9.9     Approved Equipment, Products and Services

Equipment, production vehicles, accessories, parts, chemicals and lawn care formulations used to operate a WEED MAN franchises may be acquired from any source of supply, as long as the standards of the System are met.  If THI notifies Sub-franchisor that any items being used by Sub-franchisor or any Franchisee do not meet these standards, then Sub-franchisor shall stop using such items immediately or shall cause its Franchisee to stop using such items immediately.  Sub-franchisor may request THI to approve unapproved items, but before acting on any request for approval THI may require (among other things) that free samples of the item be provided to THI or to an independent laboratory designated by THI for testing, to see if the System standards are met. Sub-franchisor shall pay for the cost of this testing.  THI may revoke its approval if any item does not continue to meet the System standards.

9.10    Insurance

Sub-franchisor shall take out and maintain throughout the Term, at its expense, such policies of insurance (including, without limitation, public liability and product liability insurance), and in such amounts, as THI may reasonably require from time to time insuring Sub-franchisor, THI, TMSI and their respective directors, officers, employees and agents against any loss, liability or other insurable risk with regard to the business being conducted by Sub-franchisor pursuant to the provisions of this Agreement.  All such insurance shall be in a form and with insurance companies that are reasonably acceptable to THI and shall provide that coverage may not be restricted in terms, amended, cancelled or not renewed without 30 days advance written notice to THI.  Sub-franchisor shall provide THI with certificates of insurance evidencing that coverage is in force, and also with certified copies of any policies if requested by THI.

**ARTICLE 10 -       RESTRICTIVE COVENANTS**

10.1    Confidential Information

Sub-franchisor and each of the Principals acknowledge that their knowledge of the operation of the WEED MAN franchise system will be derived from information disclosed to them by THI pursuant to this Agreement and otherwise, and that certain of such information constitutes confidential information or trade secrets of THI and TMSI.  Sub-franchisor and

each Principal shall maintain and shall cause their Affiliates to maintain the absolute confidentiality of such confidential information and trade secrets during and after the Term, and none of them shall use any such information or secrets in any other business or in any manner other than pursuant to this Agreement.

10.2    Non-Competition

Sub-franchisor and each of the Principals acknowledge that TMSI and THI's names and business reputations, and the methods, techniques, services, opportunities, associations and experiences established and acquired by Sub-franchisor and the Principals under this Agreement, are of considerable value.  Therefore, Sub-franchisor and the Principals covenant with THI that during the Term and for two years after expiry or termination of the Franchise Rights (for any reason) neither they nor any of their Affiliates will directly or indirectly, in any manner or capacity whatever, carry on, be engaged in, be concerned with, be interested in (including through franchising), advise, lend money to, guarantee the debts or obligations of, or permit their names to be used by any person who is engaged in, concerned with, or interested in (including through franchising), any business located within the Territory and for which more than ten percent of the annual gross sales are derived from the sale of lawn care services.

10.3    Deliver Covenants

Upon request of THI Sub-franchisor shall provide THI with the written covenants (in form specified by THI) of all shareholders, directors, officers and employees of Sub-franchisor and its Affiliates who exercise supervisory or management functions at any time during the Term, or who receive special training and instructions from TMSI or THI, or who otherwise may acquire knowledge of any confidential information or trade secrets of TMSI or THI, undertaking to be bound by all of the provisions of this Article 10.3 as if they were Sub-franchisor.

10.4    Acknowledgements

Sub-franchisor and the Principals acknowledge that since the System, the Manual and the right to use and to license others to use the Marks are all unique to TMSI and THI, the provisions of this Article 10 are reasonable, are necessary for the protection of TMSI and THI and their proprietary rights, and are consistent with the interests of the public.

**ARTICLE 11 -         TERMINATION**

11.1    Events of Default

THI may at its option terminate the Franchise Rights, effective immediately upon Sub-franchisor receiving notice of termination, in any of the following events:

(a)      [INTENTIONALLY DELETED]

(b)      if Sub-franchisor does not achieve an annual quota imposed by Section 5.1; or

(c)      if Sub-franchisor purports to assign any rights under this Agreement without fully complying with the requirements of Article 13; or

(d)      if Sub-franchisor or any of its Affiliates engages in any conduct or practice that, in the reasonable opinion of THI, reflects unfavourably on or is detrimental to the Marks, the System or the goodwill or reputation of THI or any of its franchisees, and Sub-franchisor or its Affiliate fails to permanently stop such conduct or practice within five days after receiving notice of default; or

(e)      if Sub-franchisor fails to pay an amount owing to THI (whether or not owing under this Agreement) by the payment due date and does not cure this default within fifteen days after receiving notice of default; or

(f)      if Sub-franchisor fails to deliver to THI a report or other information which is required to be submitted under this Agreement by the due date and does not cure this default within 30 days after receiving notice of default; or

(g)      if Sub-franchisor breaches any of its other obligations under this Agreement and does not cure this default within 30 days after receiving notice of default.


11.1.1      Insolvency

The Franchise Rights and this Sub-franchise Agreement shall terminate automatically, with no notice to the Sub-franchisor, if Sub-franchisor commits an act of bankruptcy, becomes insolvent or makes or gives notice of intention to make a proposal to its creditors; if a petition in bankruptcy is filed against Sub-franchisor and is not dismissed within 30 days, or Sub-franchisor becomes subject to any voluntary or involuntary bankruptcy, liquidation, dissolution, receivership, assignment, reorganisation, moratorium, composition with creditors or a similar action or proceeding that is not dismissed within 30 days after it is filed, or if Sub-franchisor otherwise attempts to take the benefit of any federal or state law now or

22

subsequently in effect for the relief of debtors; or a sheriff or other official levies execution or similar process against any assets needed to operate the Licensed Business or against any ownership interest in Sub-franchisor, or Sub-franchisor sells any substantial part of its business assets out of the ordinary course of business.

11.2    Saving Provision

If Sub-franchisor is unable to fulfil an obligation under this Agreement because a Franchisee which is not an Affiliate of Sub-franchisor has breached an obligation to Sub-franchisor under his Unit Franchise Agreement or related franchise documents, that shall not be considered an event of default under this Article 11 provided that Sub-franchisor takes prompt action at its own expense to enforce all remedies available in respect of the Franchisee's default.

**ARTICLE 12 -       EFFECT OF TERMINATION OR EXPIRY**

12.1    If the Franchise Rights expire or are terminated for any reason then

(a)     Sub-franchisor shall immediately assign to THI for nominal consideration all of the Unit Franchise Agreements and all related agreements to which Sub-franchisor is a party as franchisor, and THI shall assume all obligations of Sub-franchisor thereunder;

(b)     Sub-franchisor shall immediately stop using the System and the Marks, and shall not thereafter identify itself as a former licensee of the System and Marks;

(c)     Sub-franchisor shall immediately stop using all telephone numbers and listings which include a reference to any of the Marks, and at THI's option shall direct the supplier to transfer such telephone numbers and listings to THI or its nominee;

(d)     Sub-franchisor shall immediately deliver to THI the Manual and all promotional material and other documents in its possession which bear any of the Marks; and

(e)     within 60 days after termination or expiry there shall be an accounting between the parties as to amounts owing by each to the others under this Agreement, and any net amount found to be owing by one party to another shall be then be paid in full.

12.2     Power of Attorney

Sub-franchisor irrevocably appoints the secretary for the time being of THI as Sub-franchisor's attorney-in-fact to execute such documents and do such things as may be required to give full effect to the intent of this Article 12, and Sub-franchisor agrees to ratify and confirm whatever the secretary of THI shall do or cause to be done under this power of attorney.  THI agrees not to exercise this power of attorney until after it has requested Sub-franchisor in writing to execute the document or do the thing, and Sub-franchisor has not done so within ten days.

12.3     Remedies Not Exclusive

The right of THI to terminate in accordance with this Article 12 is not an exclusive remedy and THI shall be entitled (alternatively or cumulatively, as it chooses) to damages arising out of any breach of this Agreement, to a court order requiring performance of the obligations of this Agreement and enjoining violation thereof, and to any other remedy available at law or in equity.

## ARTICLE 13 -       ASSIGNMENT

13.1     By THI

THI may assign any of its rights under this Agreement to any person provided that the transferee agrees in writing with THI to assume all obligations relating to the rights so assigned. Upon such assignment and assumption THI shall have no further obligation regarding the matters assigned.

13.2     By Sub-franchisor

Sub-franchisor acknowledges that its rights under this Agreement are personal and that THI has granted such rights relying on the character, skills, aptitude, and business and financial strengths of Sub-franchisor and the Principals.  Therefore Sub-franchisor and the Principals shall not directly or indirectly sell, assign, convey, donate, pledge, mortgage, charge, grant a security interest in or otherwise in any manner whatever transfer or encumber (collectively, "Transfer") the Franchise Rights or any other interest in this Agreement or in Sub-franchisor, without first obtaining THI's written consent.  THI will not unreasonably withhold its consent to a Transfer, provided that all of the conditions set out in Section 13.3 have been met and THI does not exercise its option to purchase pursuant to Section 13.4.  Any

24

purported Transfer, whether occurring by operation of law or otherwise (including any assignment by a trustee in bankruptcy) without THI's prior written consent shall be a material default under this Agreement, shall be void as against THI and shall entitle THI to terminate the Franchise Rights immediately.  Sub-franchisor shall not undergo any corporate re-organizational activity (including a merger) nor issue or sell any shares, securities or other interest of any kind in Sub-franchisor.

13.3    Conditions Precedent to Transfer

THI shall be entitled to require that each of the following be satisfied as condition precedent to the granting of its consent to any Transfer:

a)    that Sub-franchisor not be in default of any of its obligations under this Agreement or any other agreement (whether or not regarding the Franchise Rights) with THI or its Affiliates;

b)    that Sub-franchisor settle all outstanding accounts with THI, its Affiliates and all suppliers to Sub-franchisor's business;

c)    that in THI's reasonable opinion the proposed transferee have a good character and reputation in the business community, have sound skills, aptitude and financial strength, and otherwise be capable of exercising the Franchise Rights and operating its business in a satisfactory and reasonably profitable manner and in accordance with the requirements of this Agreement;

d)    that at Sub-franchisor's expense, those owners or managers of a corporate transferee which THI specifies successfully complete such training with THI as THI reasonably deems to be necessary;

e)    that the proposed transferee enter into a written agreement with THI, in form reasonably prescribed by THI, assuming and agreeing to perform Sub-franchisor's obligations to THI and its Affiliates regarding the Franchise Rights;

f)    that if the transferee is not an individual, any person who owns an interest in the transferee (whether owned directly or indirectly through one or more other entities) enter into an agreement with THI, in form prescribed by THI, which will restrict the transfer of his ownership interest and, will impose on him restrictive competition and confidentiality covenants similar to those imposed on the Principals hereunder;

25

g)   that Sub-franchisor reimburse THI for all of its reasonable costs and expenses in connection with the Transfer, including legal and accounting costs, credit investigation costs, and costs of valuations, training and supervision; and

h)   that the Transfer, if approved, be completed in compliance with applicable bulk sales legislation.

13.3   THI Purchase Option

Without derogating from THI's right to withold consent pursuant to Section 13.2, if Sub-franchisor or a Principal receives a bona fide offer (the "Offer") to purchase any interest the Transfer of which is restricted by Section 13.2 (the "Franchise Asset"), which Offer Sub-franchisor or the Principal wishes to accept, then Sub-franchisor or the Principal shall notify THI of the Offer, provide a true copy of the Offer and provide full particulars of the offeror.  After THI receives this notice and information it shall have the option for a period of 30 days to purchase the Franchise Asset on the same terms and conditions as those in the Offer, except that:

a)   THI will have the right to substitute the fair cash equivalent (in THI's reasonable opinion ) of any non-cash consideration which is payable under the Offer for the Franchise Asset;

b)   THI will have the right to deduct from the purchase price the amount of any commission or fee payable to any broker, agent or other intermediary in connection with the sale contemplated by the Offer; and

c)   THI will have the right on closing to pay in full the present value at that time of any part of the purchase price for the Franchise Asset for which payment is deferred under the Offer terms until after closing.

If THI does not exercise its purchase option, approves the Transfer pursuant to Section 13.2 and the conditions of Section 13.3 are met, then Sub-franchsior may complete the Transfer in accordance with the Offer terms.  However, if the sale by Sub-franchisor to the offeree pursuant to the Offer is not completed within 90 days after THI approves the Transfer, then the provisions of this Section shall apply again regarding the proposed Transfer and so on from time to time.

**ARTICLE 14 -         GENERAL PROVISIONS**

14.1    Indemnity

Sub-franchisor shall indemnify both TMSI (as a third-party beneficiary) and THI on a full-recovery basis, both during and after the Term, against all loss, liability, damages, costs and expenses (including attorney's fees and disbursements) which either may sustain or incur as a result of any breach of this Agreement by Sub-franchisor or by Principals, any act or omission of Sub-franchisor, its Affiliates or their respective directors, officers, agents or employees, the operation of the System in the Territory, or any misrepresentation made by Sub-franchisor, its Affiliates or their respective directors, officers, agents or employees.

14.2    CPI Increases

All dollar amounts appearing in this Agreement except those in Section 4.1 and 4.2 shall be increased on each anniversary date of the signing of this Agreement by multiplying each by the CPI for the period ending on the last day of the month immediately before the calculation date, and by then dividing by the CPI for the period ending January 1, 2000.  "CPI" means the Consumer Price Index, as issued periodically by the US Department of Labor, Bureau of Labor Statistics.  If this index should cease to be published, then its successor index or any other comparable index acceptable to THI shall be substituted.

14.3    Notices

Any notice or other communication ("Notice") which is required or permitted to be given by one party to another under this Agreement shall be in writing, and shall be delivered personally or mailed by prepaid registered or certified mail to the party at his address for service shown on page 1 above.  A party may designate a different address for service by Notice to the other parties.  Notice which is sent by mail shall be deemed to have been received on the earlier of date of actual receipt and three days after date of mailing.

14.4    Further Assurances

Upon request by a party each of the other parties shall execute and deliver such documents, do such things and give such further assurances as may be necessary or desirable in order to give full effect to this Agreement.

27

14.5    Set Off

All amounts payable pursuant to this Agreement shall be paid without any demand and without any set-off, compensation, abatement or deduction whatsoever, and irrespective of any claim which Sub-franchisor may have against THI under this Agreement or otherwise. THI may apply any payments received from Sub-franchisor towards the payment of any amounts then due and owing by Sub-franchisor in such order as THI chooses, regardless of any contrary designation by Sub-franchisor.

14.6    Interest on Overdue Amounts

Except where otherwise stated in this Agreement any amount which is owing by one party to another pursuant to this Agreement shall bear interest until paid in full at the rate of 18% per annum or such lesser rate as applicable law may require. Interest shall be calculated and paid monthly on the first day of the month, not in advance, both before and after maturity, default and judgement, with interest on overdue interest at the same rate.

14.7    Force Majeure

No party shall be responsible to another for non-performance or delay in performance caused by anything beyond its control, including without limitation acts or omissions of another party, acts of civil or military authority, strike, lock-out, embargo, insurrection or act of God. If any such delay occurs then any applicable time period shall be automatically extended for a period equal to the time lost, as long as the party affected makes reasonable efforts to correct the reason for delay and gives the other parties prompt notice of the delay. For greater certainty, the inability of a party to obtain funds is deemed to be matter within that party's control.

14.8    Legend

Each outstanding stock certificate of Sub-franchisor shall have a legend printed conspicuously on its face stating that a transfer of the stock represented by the certificate is restricted by the terms of this Agreement.

14.9    Acknowledgements

Sub-franchisor and the Principals acknowledge that they have conducted an independent investigation of the matters dealt with by this Agreement, that the business venture

28

contemplated by this Agreement involves business risks and that success will be dependent upon the abilities of Sub-franchisor and the Principals.  They also acknowledge receiving legal and other professional advice regarding this Agreement and the venture contemplated from independent advisors chosen by them.

Sub-franchisor and the Principals represent, warrant and acknowledge that:

(a)     Sub-franchisor and the Principals have received a copy of the complete disclosure document concerning the franchise required by the Franchise Trade Regulation Rule of the Federal Trade Commission at least 10 business days prior to the date on which this Agreement is executed.

(b)     Sub-franchisor and the Principals have been accorded ample time and opportunity to consult with advisers of their own choosing prior to signing this Agreement.

(c)     Sub-franchisor and the Principals have received a copy of this Agreement with all blanks filled in at least five business days prior to signing it.

(d)     Sub-franchisor and the Principals are independent businesspersons and are responsible for the success or failure of the Franchised Business.

(e)     Sub-franchisor and the Principals execution of this Agreement will not violate or constitute a breach of the terms of any other agreement or commitment to which you are a party.

(f)     The individual executing this Agreement on behalf of the Sub-franchisor is duly authorized to do so; and upon its execution, this Agreement shall constitute its legal, valid and binding obligation.

(g)     Sub-franchisor and the Principals acknowledge that, except as may otherwise specifically be set forth herein or in the disclosure document referred to herein above, no representation, promises, guarantees or warranties of any kind are made or have been made by THI or by any person representing himself or herself as an authorized agent or representative of THI to induce you to execute this Agreement.

(h)     Sub-franchisor and the Principals have read fully this Agreement and all related agreements, and fully understand the terms and the import of the same, and represent that each is capable of complying and will comply therewith.

14.10   Governing Law

       This Agreement shall be governed by and interpreted in accordance with the laws of the state of Minnesota.  Sub-franchisor and Principals agree that they shall be subject to the jurisdiction of any court in the State of Minnesota in the event legal action is commenced to enforce the terms of this Agreement.

IN WITNESS WHEREOF, the parties have executed and delivered this Agreement as of the date indicated below.

DATED: _____

**TURF HOLDINGS INC.**

By: _____

Title: Chief Operating Officer

**Midwest Lawn Care LLC**

By: _____

Title: _____

_____          _____
Witness                                                     **Terry Kurth**

_____          _____
Witness                                                     **Richard J. Brachman**

_____          _____
Witness                                                     **Neil F. Wienke**

31

**EXHIBIT 1A**

**DESCRIPTION OF TERRITORY #1**

The entire states of Wisconsin and Minnesota and the following counties in the state of Illinois:

| | | |
|---|---|---|
| Boone | Jo Daviess | Ogle |
| Bureau | Kane | Rock Island |
| Carroll | Kankakee | Stephenson |
| Cook | Kendall | Whiteside |
| DeKalb | La Salle | Will |
| DuPage | Lake | Winnebago |
| Grundy | Lee | |
| Henry | McHenry | |

**Exhibit 1B**

**DESCRIPTION OF TERRITORY #2**

The entire states of North Dakota and South Dakota.

# SUB-FRANCHISE AGREEMENT

B E T W E E N:

## TURF HOLDINGS INC.

- and -

## MIDWEST LAWN CARE LLC

- and -

## TERRY KURTH

- and -

## Richard J. Brachman

- and -

## Neil F. Wienke

**ARTICLE 1    DEFINITIONS AND INTERPRETATION** ...............................................................2

    1.1    DEFINITIONS .................................................................................................................2
    1.2    TIME ............................................................................................................................4
    1.3    GOVERNING LAW .........................................................................................................4
    1.4    HEADINGS, ETC. ...........................................................................................................4
    1.5    NON-WAIVER ................................................................................................................4
    1.6    PARTS OF AGREEMENT SEVERABLE ...............................................................................4
    1.7    ENTIRE AGREEMENT .....................................................................................................2
    1.8    NUMBER, GENDER, PERSONS .........................................................................................2
    1.9    INDEPENDENT CONTRACTORS ........................................................................................2
    1.10  SUCCESSORS AND ASSIGNS ...........................................................................................2

**ARTICLE 2 -    GRANT AND TERM** .....................................................................................................3

    2.1    GRANT OF FRANCHISE RIGHTS ......................................................................................3
    2.2    TERM ...........................................................................................................................3
    2.3    TERRITORIAL RIGHTS ...................................................................................................4
    2.4    SYSTEM MODIFICATION ................................................................................................4

**ARTICLE 3 -    SERVICES** ....................................................................................................................4

    3.1    INITIAL TRAINING .........................................................................................................4
    3.2    DOCUMENTATION .........................................................................................................5
    3.3    GENERAL ADVICE AND GUIDANCE .................................................................................5
    3.4    ADVERTISING MATERIALS .............................................................................................6
    3.5    SPECIAL ASSISTANCE ...................................................................................................6
    3.6    COST OF SERVICES .......................................................................................................6

**ARTICLE 4 -    INITIAL AND CONTINUING FEES** ..........................................................................6

    4.1    INITIAL FRANCHISE FEE ................................................................................................6
    4.2    UNIT FEES ...................................................................................................................7
    4.3    ROYALTY .....................................................................................................................8
    4.4    FERTILIZER SURCHARGE ...............................................................................................9
    4.5    OTHER FEES ...............................................................................................................10

**ARTICLE 5 -    QUOTAS** ....................................................................................................................10

    5.1    NEW FRANCHISE OPENINGS ........................................................................................10
    5.2    FAILURE TO MEET QUOTA ...........................................................................................11

**ARTICLE 6 -    ADVERTISING AND PROMOTION** ........................................................................11

    6.1    NATIONAL ADVERTISING .............................................................................................11
    6.2    REGIONAL ADVERTISING .............................................................................................11
    6.3    PRE-APPROVAL OF ADVERTISING .................................................................................12
    6.4    REGIONAL AD FUND ...................................................................................................12
    6.5    NATIONAL AD FUND ...................................................................................................13

**ARTICLE 7 -    MARKS** .......................................................................................................................13

    7.1    USE OF MARKS ...........................................................................................................13
    7.2    INTEGRITY OF MARKS .................................................................................................14
    7.3    OWNERSHIP OF MARKS ...............................................................................................14
    7.4    DISCLOSURE OF FRANCHISEE STATUS ...........................................................................14
    7.5    INFRINGEMENT ...........................................................................................................15
    7.6    CHANGE OF MARKS ....................................................................................................15
    7.7    FURTHER ASSURANCES ...............................................................................................15

**ARTICLE 8 -    ACCOUNTING AND REPORTING** ..........................................................................16

8.1    BUSINESS RECORDS.................................................................................................................16
8.2    PERIODIC REPORTING............................................................................................................16
8.3    INSPECTION AND AUDIT .......................................................................................................16

**ARTICLE 9    ADDITIONAL OBLIGATIONS ...............................................................................17**

9.1    RECRUITING FRANCHISEES....................................................................................................17
9.2    [INTENTIONALLY DELETED].............................................................................................17
9.3    COMPLIANCE WITH APPLICABLE LAW ................................................................................17
9.4    PERFORM FRANCHISE COVENANTS .....................................................................................18
9.5    PROTECT SYSTEM..................................................................................................................18
9.6    PERSONNEL ...........................................................................................................................18
9.7    MAINTAIN STANDARDS .........................................................................................................18
9.8    INSPECTION RIGHTS...............................................................................................................19
9.9    APPROVED EQUIPMENT, PRODUCTS AND SERVICES .........................................................20
9.10    INSURANCE.............................................................................................................................20

**ARTICLE 10 -    RESTRICTIVE COVENANTS .............................................................................20**

10.1    CONFIDENTIAL INFORMATION .............................................................................................20
10.2    NON-COMPETITION ..............................................................................................................21
10.3    DELIVER COVENANTS ...........................................................................................................21
10.4    ACKNOWLEDGEMENTS .........................................................................................................21

**ARTICLE 11 -    TERMINATION....................................................................................................22**

11.1    EVENTS OF DEFAULT.............................................................................................................22
11.1.1    INSOLVENCY .................................................................................................................22
11.2    SAVING PROVISION ...............................................................................................................23

**ARTICLE 12 -    EFFECT OF TERMINATION OR EXPIRY........................................................23**

12.1    IF THE FRANCHISE RIGHTS EXPIRE OR ARE TERMINATED FOR ANY REASON THEN .......................23
12.2    POWER OF ATTORNEY ...........................................................................................................24
12.3    REMEDIES NOT EXCLUSIVE ..................................................................................................24

**ARTICLE 13 -    ASSIGNMENT......................................................................................................24**

13.1    BY THI...................................................................................................................................24
13.2    BY SUB-FRANCHISOR ............................................................................................................24
13.3    CONDITIONS PRECEDENT TO TRANSFER ..............................................................................25

**ARTICLE 14 -    GENERAL PROVISIONS....................................................................................27**

14.1    INDEMNITY .............................................................................................................................27
14.2    CPI INCREASES......................................................................................................................27
14.3    NOTICES .................................................................................................................................27
14.4    FURTHER ASSURANCES .........................................................................................................27
14.5    SET OFF..................................................................................................................................28
14.6    INTEREST ON OVERDUE AMOUNTS......................................................................................28
14.7    FORCE MAJEURE ...................................................................................................................28
14.8    LEGEND ..................................................................................................................................28
14.9    ACKNOWLEDGEMENTS .........................................................................................................28
14.10    GOVERNING LAW ..................................................................................................................30

**ITEM**          **DESCRIPTION**          **PAGE NO.**

**EXHIBITS**

Exhibit 1A - Description of Territory #1
Exhibit 1B – Description of Territory #2