## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF WISCONSIN

BRADLEY GOSSEN, individually and
on behalf of all others similarly situated,

      Plaintiff,

v.

TURF HOLDINGS, INC. D/B/A WEED
MAN USA, MIDWEST LAWN CARE,
LLC, and TURF CARE MADISON,
LLC,

      Defendant.

Civil Action File
No.: 3:19-CV-01013-SLC

## DEFENDANT TURF HOLDINGS, INC.'S BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

For the multiple reasons explained below, Turf Holdings, Inc. respectfully requests that this Court grant its Motion for Summary Judgment.

## I.    INTRODUCTION

At issue in this Motion is whether Turf Holdings, Inc. ("Turf Holdings" or "Franchisor"), as franchisor of the Weed Man lawn care system, is liable under the Telephone Consumer Protection Act ("TCPA") for telephone solicitation calls placed by an independent franchisee with which Turf Holdings had no direct contractual relationship, and where Turf Holdings had no involvement in the solicitations or calls and no knowledge that Plaintiff was even being contacted.

Plaintiff brings TCPA claims against three companies: Turf Holdings, Midwest Lawn Care, LLC ("Midwest" or "Sub-Franchisor"), and Turf Care Madison, LLC ("Madison" or "Franchisee"). Turf Holdings is the U.S. franchisor of the Weed Man network, a lawn care franchise system. Midwest, as sub-franchisor, contracted with Turf Holdings to obtain an exclusive geographic territory to market as Weed Man. This contract also permitted Midwest to contract with franchisees that would conduct the day-to-day Weed Man operations in Midwest's exclusive territory. As relevant to the present Complaint, Midwest contracted with Madison to operate in the Madison, Wisconsin area, where Plaintiff resides.

Madison was the franchisee who then reached out to Plaintiff about lawn services. (Turf Holdings, Inc.'s Proposed Findings of Fact ("TH PFOF") ¶ 23). After Madison made calls to Plaintiff about lawn services, Plaintiff requested to stop receiving calls, but Madison allegedly continued to call.

Madison is an independent Weed Man franchisee. (TH PFOF ¶ 19). Turf Holdings has no direct contractual relationship with Madison and does not oversee or supervise its operations. (TH PFOF ¶ 19). Turf Holdings does not require its franchisees to engage in telephone solicitations, nor does it participate in any telephone solicitations. (TH PFOF ¶ 20). Turf Holdings does provide training

2

materials to its franchisees, which specifically reference the TCPA and the importance of franchisee compliance with applicable laws and regulations. (TH PFOF ¶ 26). Turf Holdings did not participate in any solicitations involving calls to Plaintiff or approve, direct, or supervise any such solicitations. (TH PFOF ¶ 34).

Plaintiff's attempt to hold Turf Holdings liable for Madison's calls therefore fails as a matter of law. It is undisputed Madison made the telephone calls; thus, Turf Holdings is not directly liable for the calls. *See Smith v. State Farm Mut. Auto. Ins. Co.*, 30 F. Supp. 3d 765, 771 (N.D. Ill. 2014) ("Direct liability under the TCPA . . . applies only to entities that 'initiate' the telemarketing calls.").

Turf Holdings can only be liable through vicarious liability. The TCPA incorporates federal common law principles of agency for telemarketing calls. *In re Joint Petition filed by Dish Network, LLC*, 28 F.C.C.R. 6574, 6583-84 (May 9, 2013). In this case, undisputed facts confirm that Turf Holdings did not, *inter alia*, have a contract with Madison, authorize or direct Madison to make the calls to Plaintiff, have any control over Madison's day-to-day telephone calls, have any contract with Madison's calling platform, or permit any actions that would violate any laws or regulations. Using the language from the seminal TCPA case involving the responsibility of a franchisor for the actions of a franchisee, there is no evidence that Turf Holdings "controlled or had the right to control [Madison] and,

more specifically, the manner and means of the [Madison telephone] campaign." *Thomas v. Taco Bell Corp.*, 879 F. Supp. 2d 1079, 1084 (C.D. Cal. 2012), *aff'd*, 582 F. App'x 678 (9th Cir. 2014); *cf. Smith*, 30 F. Supp. 3d at 775–76 (finding contract that "specified the days of the week and times in which [vendor] should make its calls, the geographic location of the customers whom it should call, and the number of calls [it] should transfer to the insurance agency each day" showed "a level of control" sufficient to find an agency relationship).

As a genuine issue of material fact is not present as to whether Turf Holdings is directly or vicariously liable for calls to Plaintiff, Turf Holdings respectfully requests that this Court grant summary judgment in its favor.

## II.    RELEVANT BACKGROUND

### A.    <u>Turf Holdings and Its Franchise System</u>

Turf Holdings is a franchisor of a franchise system that operates throughout the United States. (TH PFOF, ¶ 5). The franchise system commonly operates by the name of Weed Man. (TH PFOF, ¶ 5). Weed Man is a network of locally owned and operated lawn care professionals providing environmentally responsible fertilization, weed control, and integrated pest management services. (TH PFOF, ¶ 5, 6). Weed Man began in Canada in 1970 and ventured into franchising in the United States in 1996. (TH PFOF, ¶ 7). Each locally owned and operated group

4

operates as a franchisee, with many franchisees contracting with a sub-franchisor for operations. (TH PFOF, ¶ 8).

As relevant to this lawsuit, Turf Holdings entered into a Sub-Franchisor Agreement with Midwest in 2000. (TH PFOF, ¶ 9). In August, 2010, the Sub-Franchisor Agreement was renewed for another ten years, and then again for another ten years in August of 2020. (TH PFOF, ¶¶ 9-13). The Sub-Franchisor Agreement allowed Midwest to contract with franchisees to operate as Weed Man in an exclusive territory of Wisconsin, Minnesota, and twenty-two counties in Illinois. (TH PFOF, ¶ 14).

The Sub-Franchisor Agreement requires, under a heading titled "Compliance with Applicable Law," that "[i]n dealing with Franchisees and otherwise conducting its business, Sub-Franchisor shall comply with all applicable laws and regulations." (TH PFOF, ¶ 15). The Sub-Franchisor Agreement also provides:

1.9 Independent Contractors

The parties are independent contractors. Nothing in this Agreement gives any party the right to bind another party to any obligation, or to assume or to incur any obligation on behalf of or in the name of another party. This Agreement shall not be interpreted to make one party a partner, joint venturer, employee, agent, fiduciary or other representative of another party for any purpose. Each party shall use his own name when soliciting, negotiating and completing contracts, so that the transaction indicates that he is acting on his own behalf and not for any other party.

5

(TH PFOF, ¶ 16).

Midwest has a separate contract with the franchisee that made the calls in this lawsuit. Specifically, on October 1, 2013, Midwest entered into a Unit Franchise Agreement with Madison ("Franchise Agreement"). (TH PFOF, ¶¶ 17-18). This Franchise Agreement permitted Madison to operate in a portion of Midwest's exclusive territory, specifically parts of Wisconsin. (TH PFOF, ¶ 19). Turf Holdings is not a party to the Franchise Agreement. (TH PFOF, ¶ 20).

### B.   Franchisee's Marketing

Turf Holdings does not market directly to consumers. (TH PFOF, ¶ 22). Some local franchisees, including Madison, engage in targeted marketing to consumers. It is up to each individual franchisee to decide what marketing methods to utilize, which may include flyers, direct mail, telephone calls, and door-knocking campaigns, to advertise their business and solicit customers. (TH PFOF, ¶ 23-24). Turf Holdings does not regulate or subsidize franchisees for marketing. (TH PFOF, ¶ 27). Turf Holdings does issue training materials stating, among other things, "It is crucial that you understand your state do not call legislation" and "It is crucial to train your telemarketers/sales agents/customer service representatives properly on how to handle calling a person that is on the 'Do Not Call List.'" (TH PFOF, ¶¶ 28-29).

C.   **Plaintiff's Allegations**

On December 12, 2019, Plaintiff filed this putative class action against Turf Holdings. Plaintiff subsequently filed a First Amended Complaint that joined Midwest and Madison. The First Amended Complaint alleges violations of 47 U.S.C. § 227 against all defendants for placing telemarketing calls to consumers despite "do not call" requests and/or where the consumer's telephone number was included on the National Do Not Call registry.[1] (ECF No. 1 at ¶ 2).

Plaintiff alleged that a Weed Man representative showed up unannounced at his house to notify him that the previous owner had utilized Weed Man's services and to inquire whether he was interested in continuing the services. (*Id.* at ¶ 38). Plaintiff admits that he provided his phone number to Weed Man's representative. (*Id.* at ¶ 39). He received multiple calls in April of 2018 and, by the end of June 2018, had received nearly thirty automated telemarketing calls. (*Id.* ¶¶ 41, 48). Plaintiff says that at some point he requested that the calls stop, but that the calls continued. (*Id.* ¶ 42). Plaintiff's complaint states that "Turf Care Madison initiated the calls [Plaintiff] received in conjunction with sub-franchisor, Midwest

---

[1] Turf Holdings disputes that these were made using an automatic telephone dialing system ("ATDS") as defined by the TCPA. However, the First Amended Complaint no longer seeks to recover for calls allegedly violating the TCPA's regulations on the use of an ATDS.

Lawn . . . ." (*Id.* ¶ 42). There is no allegation, much less evidence, that Turf Holdings had any role in initiating, placing, or facilitating any of the calls made to Plaintiff.

## III.   LEGAL STANDARD

Summary judgment is appropriate where there is "no genuine dispute as to any material fact" and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A genuine issue of material fact exists only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Pugh v. City of Attica*, 259 F.3d 619, 625 (7th Cir. 2001) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Where the nonmovant bears the burden on an issue, Rule 56 merely requires pointing out "that there is an absence of evidence to support the nonmoving party's case." *Modrowski v. Pigatto*, 712 F.3d 1166, 1168 (7th Cir. 2013) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).

## IV.   ARGUMENT AND CITATION OF AUTHORITIES

Turf Holdings is not liable for the telephone calls made by Madison. There are four theories of liability to hold a party liable under the TCPA: direct liability, and three theories of vicarious liability that are actual authority, apparent authority, and ratification.

8

The TCPA makes it is unlawful to "initiate any telephone call." 47 U.S.C. §

227(b)(1)(B). The entity that physically dials the telephone is directly liable if the

call violates the TCPA. Courts have also recognized that federal common law of

agency can apply and that some parties may be vicariously liable for calls under

the TCPA. The Seventh Circuit recognizes that the federal common law of agency

is based significantly on the Restatement of Agency. *See Moriarty v. Glueckert*

*Funeral Home, Ltd*., 155 F.3d 859, 865 n.15 (7th Cir. 1998) ("[I]n developing the

federal law of agency, courts have relied on the Restatement of Agency as a

valuable source for those general agency principles."). An entity can be liable

under actual authority (also known as formal agency), apparent authority, and

ratification. *Dish Network*, 28 F.C.C.R. at 6593 ¶ 28; *see also Henderson v. United*

*Student Aid Funds, Inc.*, 918 F.3d 1068, 1072 (9th Cir. 2019).

### A.   Turf Holdings Is Not Directly Liable for the Calls.

Turf Holdings did not initiate the calls to Plaintiff and cannot be held

directly liable for the calls. In *Dish Network*, the FCC began by addressing the

conduct required to establish direct liability for telemarketing calls under the

TCPA and the FCC's implementing regulations. 28 F.C.C.R. at 6582-6584.

Specifically, it is unlawful to "initiate any telephone call" and to "initiate any

telephone solicitation." *Id.* at 6582-83. The word "initiate" suggested a direct

9

connection between a person or entity and the making of a call. *Id.* at 6583. Thus, a

person or entity initiates a telephone call when it physically places a telephone call.

This excludes entities "that might merely have some role, however minor, in the

causal chain that results in the making of a telephone call." *Id.*; *Lucas v.

Telemarketer*, No. 1:12-CV-630, 2014 WL 1119594, at *6 (S.D. Ohio Mar. 20,

2014).

Turf Holdings did not "initiate" or take steps to physically place calls to the

Plaintiff. (TH PFOF, ¶ 32). Turf Holdings did not own or operate the telephone

equipment used to make calls. (TH PFOF, ¶ 33). It did not own, lease, or otherwise

use the phone lines used to transmit the calls. (TH PFOF, ¶ 34). Plaintiff

mistakenly alleges in his Amended Complaint that Turf Holdings operates a

centralized calling center in Pennsylvania based on a hearsay quotation from a

Better Business Bureau website, which itself does not even support the inference

Plaintiffs seek to draw. (ECF No. 18 at ¶ 49 ("It seems there was some *confusion

or miscommunication* that you were speaking to someone from the Weed Man

USA headquarters.")). Further, a separate franchisee has now confirmed that this

was in reference to its customer calling in Pennsylvania. (TH PFOF, ¶ 41-45).

Weed Man does not operate a centralized calling center, and Madison's calls to

this Plaintiff had nothing to do with the Pennsylvania calling location. (TH PFOF,

¶ 41-45). The undisputed *admissible* evidence establishes that Turf Holdings does not make telemarketing calls to consumers and does not operate any calling centers.[2] The calls to Plaintiff were made by Madison. (TH PFOF, ¶ 25). Accordingly, undisputed factual evidence shows that Turf Holdings is not directly liable for the calls.

### B.  Turf Holdings Is Not Vicariously Liable for the Calls.

Nor is Turf Holdings vicariously liable for the calls placed to Plaintiff. The Seventh Circuit applies agency principles to determine vicarious liability, and there are three types of agency: (1) actual authority, (2) apparent authority, and (3) ratification. *Bridgeview Health Care Ctr., Ltd. v. Clark*, 816 F.3d 935, 938 (7th Cir. 2016); *Bilek v. Nat'l Cong. of Employers, Inc.*, No. 1:18-CV-03083, 2020 WL 5033534, at *2 (N.D. Ill. July 1, 2020). None is applicable here.

### 1.  Turf Holdings Is Not Liable Under An Actual Authority Theory.

The first theory is actual authority. "An essential element of agency is the principal's right to control the agent's actions." Restatement (Third) of Agency § 1.01, cmt. f(1). Not every relationship is one that qualifies as an agency

---

[2] *Nat'l Soffit & Escutcheons v. Superior Sys., Inc.*, 98 F.3d 262, 266 (7th Cir. 1996) (holding that unsupported allegations do not raise an issue of fact precluding summary judgment).

relationship, and instead it must rise to a fiduciary level and requires the manifestation of the principal's assent that the agent shall act on the principal's behalf and "subject to the principal's control." *Id.* § 1.01. A contract is generally required to find a principal/agent relationship, but even with a contract an agency relationship is not necessarily formed; "the power to give interim instructions distinguishes principals in agency relationships from those who contract to receive services provided by persons who are not agents." *Id.* § 1.01, cmt. f(1) (emphasis added).

The seminal TCPA case on actual authority in the franchisor/franchisee context is *Thomas v. Taco Bell Corp.*, 879 F. Supp.2d 1079 (C.D. Cal. 2012), *aff'd*, 582 F. App'x 678 (9th Cir. 2014). The lawsuit involved a text message marketing campaign conducted by a collection of Taco Bell franchisees. *Id.*[3] The plaintiff argued that Taco Bell, the franchisor, was vicariously liable for the franchisees sending text messages. *Id.* The court found that the plaintiff could not demonstrate an agency relationship. *Id.* To succeed on this vicarious liability theory, the court held that Plaintiff "must demonstrate that these entities acted as an agent of Taco

---

[3] The word "call" in the TCPA has been interpreted to include text messages, and thus the TCPA's regulations regarding telephone calls and text messages are identical. *See Drew v. Am. Directions Research, Grp.*, No. 20-CV-00402, 2020 WL 6118539, at *2 (N.D. Ill. Oct. 16, 2020) (citing *Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 156 (2016)).

Bell: that Taco Bell controlled or had the right to control them and, more specifically, the manner and means of the text message campaign they conducted." *Id.* at 1085.

The court found that Taco Bell's conduct did not amount to control over the manner and means by which the campaign was executed, noting that Taco Bell did not create or develop the message, did not direct or supervise the manner of transmission, and did not play any role in the decision to distribute the message in a way that was violative of the TCPA. *Id.* at 1085–1086. All of the decisions regarding who to send the text messages to, how to send the messages, and the content of the messages was made by the franchisee. *Id.* The plaintiff argued that Taco Bell's marketing policies, pursuant to which it would pay the invoices of vendors to the local association in certain instances, demonstrated that Taco Bell retained control over the association. *Id.* The court rejected that argument, holding that even if Taco Bell authorized the release of its own funds for the campaign, that type of "purse strings" theory did not establish that Taco Bell controlled the campaign's design and execution. *Id.*

Similarly, in *Bridgeview Health Care Ctr., Ltd. v. Clark*, 816 F.3d 935, 939 (7th Cir. 2016), plaintiff sought to hold Health Care Center liable under the TCPA

13

for the actions of B2B, a third-party vendor that sent facsimile messages.[4]

Healthcare Center instructed B2B to send about 100 faxes to local businesses within a 20–mile radius of its business. *Id.* at 939. B2B instead sent over 4,849 faxes to three different states. *Id.* Although Healthcare Center could be liable for faxes that it authorized B2B to send within 20 miles, Healthcare Center was not vicariously liable for the faxes sent outside of the 20 mile radius. *Id.* For actual authority to exist, Healthcare Center's employees must have directly advised B2B to send nearly 5,000 advertisements to multiple different states. *Id.* There was no evidence that this occurred. Further, there was no evidence of implied actual authority. *Id.* Although B2B was hired to conduct fax marketing, nothing about fax marketing inherently provided permission for B2B to send thousands of unsolicited fax messages. *Id.*; *see also Meeks v. Buffalo Wild Wings, Inc.*, 2018 WL 1524067, at *6 (N.D. Cal. 2018) (dismissing vicarious liability for a TCPA violation because the plaintiff failed to sufficiently demonstrate that the defendant exhibited any control over "whether, when, and to whom to send the text messages, along with their content."); *Bilek v. Fed. Ins. Co.*, No. 19 C 8389, 2020 WL 3960445, at *5 (N.D. Ill. July 13, 2020) ("Here, the complaint only alleges a degree of control

---

[4] Similar agency principles apply to TCPA cases involving faxes and telephone calls. *See id.*

with respect to content; Bilek alleges HII provided the telemarketers with a script. However, Bilek does not allege that HII controlled the timing of the calls, the quantity of calls, to whom the calls are made, or any geographic location to target. Accordingly, Bilek has not plausibly alleged an agency relationship based on actual authority.").

By contrast, in *Smith*, the court held that the plaintiff alleged a sufficient factual basis to hold the defendant vicariously liable for a TCPA violation where the complaint included details of the defendant's control over the quality, timing, and volume of calls. *Cf. Smith*, 30 F. Supp. 3d at 775.

Here, none of the facts in evidence establishes the high degree of involvement" required for actual authority the TCPA. Significantly, Turf Holdings did not control or have the right to control Madison. (TH PFOF, ¶ 26); *see Taco Bell*, 879 F. Supp. 2d at 1084. The record evidence is to the contrary.

Turf Holdings did not create or develop the messages for the telephone campaign of the franchisee, did not direct or supervise the manner of transmission, and did not play any role in the decision to make calls in a way that was (allegedly) violative of the TCPA. (TH PFOF, ¶ 35-39). Turf Holdings does not control the timing of the telephone calls, the quantity of telephone calls, or to whom the calls are made. *Cf. Smith*, 30 F. Supp. 3d 765, 775–76 (N.D. Ill. 2014) (finding contract

15

that "specified the days of the week and times in which Variable should make its calls, the geographic location of the customers whom it should call, and the number of calls [it] should transfer to the insurance agency each day" showed "a level of control" sufficient to find an agency relationship). Turf Holdings does not require any specific calling platform for franchisees to use (or even require that a platform be utilized), and Turf Holdings had no access, and continues to have no access, to the calling records for this franchisee. (TH PFOF, ¶ 37).

Further, Turf Holdings does not subsidize or finance any of the telemarketing activities of its vendors. (TH PFOF, ¶ 38). Turf Holdings does not pay for the use of the calling system or even have a contract with any the calling platform utilized by the franchisee. (TH PFOF, ¶ 39). But even if it did, "mere approval and funds administration cannot be equated with control over the manner and means by which the campaign was designed and executed." *Taco Bell*, 879 F. Supp. 2d at 1085.

Plaintiffs cannot rely on implied agency either. Implied authority is based on "conduct of the principal which, reasonably interpreted, causes the agent to believe that that principal desires him so to act on the principal's account." *Moriarty v. Glueckert Funeral Home, Ltd.*, 155 F.3d 859, 866 (7th Cir. 1998) (quoting Restatement (Second) of Agency, § 26 (1958)). "In other words, it is concerned

with the impression of a grant of specific power created by the principal in the mind of the agent." *Testa v. Emeritus Corp.*, No. 15 C 02449, 2015 WL 5183900, at *8 (N.D. Ill. Sept. 4, 2015). Midwest entered into a contract stating that it "shall comply with all applicable laws and regulations." (TH PFOF, ¶ 15). Turf Holdings does not have any contractual relationship with Madison, let alone has never transmitted any documents that could be reasonably seen as authorizing Madison to make any calls in violation of the DNC. Certainly Turf Holdings never authorized its sub-franchisors or franchisees to call individuals after they had asked to be placed on the franchisee's DNC list. Instead, Turf Holdings issues training materials notifying sub-franchisors and franchisees that, *inter alia*, "It is crucial that you understand your state do not call legislation" and "It is crucial to train your telemarketers/sales agents/customer service representatives properly on how to handle calling a person that is on the "Do Not Call List." (TH PFOF, ¶ 28).

Turf Holdings is not liable under an actual authority theory.

### 2. <u>Turf Holdings Is Not Liable Under An Apparent Authority Theory.</u>

Apparent authority exists when "a third party reasonably believes the actor has authority to act on behalf of the principal and that belief is traceable to the principal's manifestations." Restatement (Third) of Agency § 2.03 (2006); *Weil, Freiburg & Thomas, P.C. v. Sara Lee Corp.*, 577 N.E.2d 1344, 1350 (Ill. 1991))

17

("Apparent authority arises when a principal creates, by its words or its conduct, the reasonable impression in a third party that the agent has the authority to perform a certain act on its behalf."). Under the facts presented in this case, Turf Holdings cannot be liable under an apparent authority theory for two primary reasons.

First, it is well-established that apparent authority must derive from the statements or actions of the alleged principal, not the alleged agent. *See Opp v. Wheaton Van Lines, Inc.*, 231 F.3d 1060, 1064 (7th Cir. 2000) ("[O]nly the words or conduct of the alleged principal, not the alleged agent, establish the [actual or apparent] authority of an agent." (second alternation in original));[5] *Taco Bell*, 2014 WL 2959160, at *2 ("Apparent authority is inapplicable because it can only 'be established by proof of something said or done by the [alleged principal] . . . .'"); *see also* Restatement (Third) of Agency § 2.03 cmt. c ("An agent's success in

---

[5] Madison was not an agent of Turf Holdings for numerous reasons described above. In addition, the contract between the Turf Holdings and Midwest specifically states that the parties are independent contractors and that the "Agreement shall not be interpreted to make one party an . . . agent, fiduciary, or representative of another party for any purpose." (Exhibit B at 5). If Midwest is not an agent of Turf Holdings, then certainly Madison is not an agent. Regardless, *even if* there was an agency relationship, "statements by an agent are insufficient to create apparent authority without also tracing the statements to a principal's manifestations or control." *Warciak v. Subway Restaurants, Inc.*, 949 F.3d 354, 357 (7th Cir. 2020). Turf Holdings did not exercise any control over Madison.

misleading the third party as to the existence of actual authority does not itself make the principal accountable."). In other words, for apparent authority to exist, the principal "must communicate either directly or indirectly with the third party." *Bridgeview Health Care Ctr., Ltd. v. Clark*, No. 09 C 5601, 2013 WL 4495221, at *3 (N.D. Ill. Aug. 21, 2013). Prior to this lawsuit being filed, Turf Holdings never communicated with Plaintiff, and certainly never communicated to Plaintiff that Madison was authorized to speak on its behalf. (TH PFOF, ¶ 40). Because Plaintiff did not communicate directly or indirectly with Turf Holdings, Plaintiffs cannot hold Turf Holdings liable under an apparent authority theory.

Plaintiff may point out that Madison was licensed to use the Weed Man trade name while soliciting business. That, however, does not change the analysis. In *Warciak v. Subway Restaurants, Inc.*, 949 F.3d 354, 357 (7th Cir. 2020), a Plaintiff sued Subway for messages that were sent by T-Mobile. The plaintiff argued that T-Mobile's message, which used the Subway name, "led recipients to believe the text came from Subway." *Id.* But this was not enough because "statements by an agent are insufficient to create apparent authority without also tracing the statements to a principal's manifestations or control." And a district court in the Seventh Circuit recently applied *Warciak* to a similar case involving State Farm insurance company and its agents. In *Clemons v. State Farm Mut. Auto.*

19

*Ins. Co.*, No. 1:20-CV-1050, 2020 WL 4193997, at *6 (C.D. Ill. July 21, 2020), the court dismissed plaintiff's argument that it would be difficult for a consumer to know the difference between State Farm Mutual and State Farm individual insurance agents when a caller was speaking on behalf of "State Farm;" however, State Farm Mutual did not communicate with the plaintiff and the fact that "the agent invoked the principal's brand is similarly insufficient" for apparent authority. *Id.* Thus, *even if* the franchisee here was generally operating under the name Turf Holdings or Weed Man, this still is not enough unless Turf Holdings actively communicated with the Plaintiff.

Second, even had Turf Holdings directly communicated with Plaintiff, the Seventh Circuit in *Warciak* held that apparent authority requires proof that the plaintiff "reasonably relied, to his detriment, on any apparent authority with which he alleges." 949 F.3d at 357 (emphasis added); *see also Clemons*, 2020 WL 4193997, at *6 (holding, in a TCPA action alleged vicarious liability under an apparent authority theory, that "Plaintiffs additionally fail to allege any facts explaining how they reasonably relied, to their detriment, on any manifestation by Defendant vesting the telemarketers with authority"); *Thomas v. Taco Bell Corp.*, 582 F. App'x 678, 679–80 (9th Cir. 2014) ("Thomas has not shown that she reasonably relied, much less to her detriment, on any apparent authority with

which Taco Bell Corp. allegedly cloaked the Chicago Association, ESW, or

Ipsh."). For example, in *Moore v. Charter Communications, Inc.*, No. 20-CV-

00980, 2020 WL 6287403, at *5 (N.D. Ill. Oct. 27, 2020), the plaintiff alleged that

Charter Communications was liable under apparent liability after Charter

Communications sent two emails in follow-up to solicitation calls he received from

a third party. But plaintiff's claims failed as a matter of law because the plaintiff

did not allege that he purchased any services, and thus he could not have relied on

any communications from Charter to his detriment. *Id.* Indeed, the Complaint does

not allege that Plaintiff even knew of Turf Holding's existence or misconstrued

any communications as coming from Turf Holdings.

Here, similarly, Plaintiff has never utilized any services of Turf Holdings,

Midwest, or Madison. (ECF 18 at ¶ 34). Plaintiff's apparent authority argument

fails because he cannot establish reasonable reliance.

### 3.    Turf Holdings Is Not Liable Under A Ratification Theory.

Turf Holdings is not liable under a ratification theory for at least three

reasons. "Ratification is the affirmance of a prior act done by another, whereby the

act is given effect as if done by an agent acting with actual authority." *Warciak v.*

*Subway Restaurants, Inc.*, No. 1:16-CV-08694, 2019 WL 978666, *3 (N.D. Ill.

Feb. 28, 2019).

First, "ratification is unavailable where neither actual nor apparent authority exist." *Id.*; *see also id.* ("Therefore, to establish vicarious liability under [ratification, Plaintiff] would need to allege that he reasonably believed T-Mobile text messaged him as Subway's agent and that his belief is traceable to some communication from Subway."). Because the two theories discussed above fail, there can be no liability under a ratification theory.

Second, "[e]ven if a principal ratifies an agent's act, the principal is not bound by a ratification made without knowledge of material facts about the agent's act unless the principal chose to ratify with awareness that such knowledge was lacking.'" *Id.* (quoting Restatement (Third) of Agency § 4.01 cmt. b (2006)). *See also Smith*, 30 F. Supp. 3d at 779 (same). Here, as in *Kristensen v. Credit Payment Services Inc.*, 879 F.3d 1010, 1015 (9th Cir. 2018), Plaintiff "presented no evidence that [Turf Holdings] had actual knowledge that [its franchisee] was sending text messages [or making telephone calls] in violation of the TCPA." Indeed, the evidence shows the opposite. Turf Holdings issued training to Midwest that "[i]t is crucial to train your telemarketers/sales agents/customer service representatives properly on how to handle calling a person that is on the 'Do Not Call List.'" (TH PFOF, ¶ 29). The training goes further, noting that telephone calls should only be made once the DNC procedure has been completed. (TH PFOF, ¶¶

22

28-29). And even though Turf Holdings was aware that some of its franchisees were making telephone calls to consumers, "knowledge that an agent is engaged in an otherwise commonplace marketing activity is not the sort of red flag that would lead a reasonable person to investigate whether the agent was engaging in unlawful activities." *Kristensen*, 879 F.3d at 1015.

## V.     CONCLUSION

Turf Holdings respectfully requests that this Court GRANT its Motion for Summary Judgment.

Respectfully submitted, this 21st day of December, 2020.


*/s/ Nathan L. Garroway*

Nathan L. Garroway (*pro hac vice*)
Georgia Bar No. 142194
nathan.garroway@dentons.com
Mark A. Silver (*pro hac vice*)
Georgia Bar No. 811928
mark.silver@dentons.com

DENTONS US LLP
303 Peachtree Street, NE. Suite 5300
Atlanta, GA 30308
Telephone:   (404) 527-4000
Facsimile:     (404) 527-4198

Richard L. Fenton (*pro hac vice*)
Illinois Bar No. 3121699
richard.fenton@dentons.com

DENTONS US LLP
233 S. Wacker Drive, Suite 5900
Chicago, Illinois 60606
Telephone: (312) 876-8000
Facsimile:  (312) 876-7934

*Attorneys for Defendant*

## **CERTIFICATE OF SERVICE**

I hereby certify that on December 21st, 2020, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which sent notification of such filing to all counsel of record.


By:  */s/ Mark A. Silver*
            Mark A. Silver